Argument not to exceed 15 minutes per side. Mr. Pearson, you may proceed for the appellate. Good morning, Your Honors. May it please the Court. My name is Stephen Pearson. I'm here with my associate, Ted Kim, on behalf of Edgewood Partners Insurance Center. We're here a second time before this Court on an appeal following entry of preliminary injunctive relief. What's not at issue are all the prerequisites for entry of preliminary injunctive relief. That's been determined by the District Court and been affirmed in Appeal No. 1 by this Court. What is at issue on this appeal is the distinctions under New York law with regard to what amounts to 41 total clients. 41 total clients, which Mr. Thompson brought with him, which he formed relationships with over the history of his time as an insurance producer, and ultimately brought with him to USI. There are a number of asset purchase agreements that are at issue in this case, and I just want to walk the Court briefly through those because we are ultimately going to come back to the one that is pertinent to this appeal. Didn't we resolve this issue the first time? The remand was just to look at how he got these 41 clients, right? Didn't we reject your argument? No. No, Your Honor. This is why. There's never been a finding by either the District Court nor was there a finding by this Court in Appeal No. 1 with regard to the issue of the New York standard for enforcement of restrictive covenants, which are ancillary to the sale of business, as it related to the clients which Mr. Thompson acquired when he formed Hyland. Prior to the time he formed Hyland and when Hyland was sold to USI. In fact, there did need to be a remand with regard to the application of BDO Seidman with regard to the four clients which Mr. Thompson acquired while he was at USI. Why? Because during the period of time he was employed by USI, it is correct that the BDO Seidman standard applied because there was no asset sale with regard to controlling asset sale or employment agreement that was ancillary to that asset sale post acquisition of Hyland by USI. So while Mr. Thompson was an employee of USI, the BDO standard applied. There's never been a determination with regard to or rejection of the premise that the clients which Mr. Thompson formed relationships with, brought to Hyland, formed this entity within Hyland, Hyland Specialty Programs, and then sold, that was sold to USI as an asset purchase sale, which included the goodwill of all of those client relationships. And that was sold to USI. I'm sorry. Wasn't that argument necessarily rejected for the – otherwise there would not have been a need for the remand, right? I mean, didn't you make this argument in the first appeal and they remanded to do this inquiry about these other – about the 41 clients, and therefore, at least implicitly, if not explicitly, the first panel rejected the argument, right? No. Again, Your Honor, when this issue came up during the oral argument in the first appeal, there had never been any presentation of evidence with regard to what I call an allocation model of the timing that these clients were acquired. The district court had never addressed the difference between the BDO Seidman standard, applicable to some clients, and the White's ancillary to sale of assets standard under New York law. So there was never an analysis that had been performed when clients of Mr. Thompson came to him and when he had the relationship. We went back down on remand and the evidence established that you had – the vast majority of these clients, 37 of these 41 clients, were acquired by Mr. Thompson prior to the time that Hyland sold its assets to USI. That means that only the four remaining, which the district court was correct about, which should be controlled by the BDO standard, those clients were allocated into that bucket. There has never been a determination, not by this court nor by the district court, that the ancillary to the sale of business standard does not control in this case with respect to certain clients. What would be the – first of all, Mr. Thompson didn't sell the business, right? He was not a signatory to the business, to the sale of the assets. That's correct. So when the case came up the last time, didn't you argue that the proper standard is the sale – ancillary to the sale of business standard? We argued that in the district court and we argued it in our briefs in this court, and it was never addressed. I'm sorry. When it was on appeal before, you argued that the proper standard is the standard that applies when the employment restraint is ancillary to the sale of the business. That's correct, Your Honor. Okay. That's correct. That's what you argued to the prior panel. That's correct, and we have not – we did not get a decision on that issue. Yes, but you got a remand with instructions to the trial court to apply the other standard, the BDO standard. That is not how I read that ruling. How I read that ruling was a remand to determine which clients the BDO standard applied to, and that's why the district court did apportion. He did find that there were four customers, four clients that the preliminary injunction ruling should remain in place with regard to, but he did not make any determination as a matter of law with regard to this ancillary to the sale of business standard. There is no case law in New York that I've seen or that's been cited that requires that Mr. Thompson have been a signatory to that sales agreement, and the employment agreement that he entered into is replete with representations and acknowledgments by him that it was being entered into part and parcel and therefore ancillary to the sale of those assets. That's – we argued that on remand before, and we've raised it squarely for a determination of this issue now for us. So okay, you're trying to draw a distinction between which standard applies to which customers and applying the standard properly. So that only customers that he would have obtained or that he obtained without regard to the support of the employer are included. And you're saying – you're arguing the former rather than the latter, that what the court did here was apply that BTO standard to everyone. Correct. That's correct. What is it about the prior opinion that left open the possibility of not applying that standard when the very instruction was basically separate them out so that he can pursue certain ones and not others? It's two things, Your Honor. The opinion begins – in Appeal No. 1 begins with the premise that Brian Hall and Michael Thompson – Can you – I can't hear you. I'm very sorry. I'm struggling with the phone now. I'll make sure it's safe. Use the mic. The opinion begins with the premise that Michael Thompson and Brian Hall formed that business division, sold their client, and sold their goodwill to USI. Okay? And then remands – follows up on that and remands with directions to the district court to determine which clients would be controlled by the BTO sequence standard. Why? Plaintiff's case was always premised from the very beginning – their complaint is explicit in this regard – was always premised on a wholesale application of the BTO sequence standard to their case. That's an incorrect application of New York law under the continuum of events that are at issue here. And there was no determination in this appeal – if I can finish. There was no determination in Appeal No. 1 that the ancillary to business standard did not apply. Rather, it was remanded because there was no factual record before the war. But the remand says, look at which ones he recruited before, whatever. That is the standard, right? They are applying the BTO sequence standard and saying, look at which clients were – and then those are the ones that he's allowed to keep. I don't – and of course I don't deny that, Your Honor, but there's nothing in this decision that addresses – decision number one – that addresses or rejects much of it. So you're saying with the opinion left open, this show-stopping argument that actually everything we said is meaningless because this other standard might apply the sale of assets and what we said is just dead letter, right? It wouldn't apply in this case? No, no, not at all. I don't think it's that polar opposite result at all. I think there – because there had been no evidence in the record developed in the district court with regard to when these clients came in. There was no way for this court out of Appeal No. 1 to make that kind of allocation determination. And so it's remanded under – to apply the BTO Seidman standard, but to what clients? To what clients? If the – say it differently. If this court had ruled in Case No. 1 that the only way the ancillary to business standard could apply is if Mr. Thompson were a signatory to the sales agreement, we wouldn't be here. The court did not find that, and it couldn't go further than where it did because it didn't have an evidentiary record to do that. We go back on remand, present these arguments to the district court. There is still no determination by the district court on this issue. This issue still remains open to the district court. Well, right, and your case isn't over. This is an injunction. Understood, but we're talking about the application now of law, settled law, to undisputed facts. We're not here arguing about any facts. That's why I started with the premise the prerequisites for the preliminary injunctive relief have been met. What law applies under these circumstances to dictate the relief that should have been entered? And we're back, then, to the allocation issue with regard to appropriate application of New York law. Okay, I'd like to reserve the last couple minutes I have if I could. Okay. Thank you, Kevin. Good morning. I'm going to introduce the court, Greg Wagner, on behalf of Appellee Michael Thompson. As the court has noted, this is the second time we are here dealing with the same issue. The application of BBO Seidman to Mr. Thompson in all aspects was directly briefed by appellant in the earlier appeal. It was a part of the oral argument in the earlier appeal, and it was specifically addressed in the decision by the court in the earlier appeal. Except the issue of which applies is not dealt with in that opinion, and it seems like the facts aren't even accurate, right? The issue of the application of BBO Seidman was dealt with in the earlier appeal. Was there a discussion of why that's the standard and not the answer to sales standard? Yes, because Mr. Thompson was not an owner and did not sell any of his – sell any interest. Was that in the opinion? It was – the ownership of BBO – Mr. Thompson's ownership was not specifically addressed in the opinion. It was addressed in the briefs by – that were filed by the appellants. Okay. Well, that's what I'm saying. It's not in the opinion. There's no discussion in the opinion of which standard applies and why. The only thing you have is you can make an inference that perhaps the court thought about it because there was a remand to apply one of the two cases. But I don't recall ever seeing a discussion of why one applies. In the facts, Your Honor, for the application of BBO Seidman to Mr. Thompson in respect of both asset purchase agreements is that Mr. Thompson was not an owner and did not sell any goodwill in either situation. And therefore, under controlling New York law, the sale of business exception does not apply to Mr. Thompson. He was an employee of Highland HSP, and he was an employee of USI. Under those facts, the controlling standard under New York law is BBO Seidman. But if the sale of business exception had applied, he wouldn't have been able to keep any clients, right? Is that right? If the sale of business exception had applied, it would – the BBO standard would not apply and he would not have been able to keep his clients. So the first panel, by acknowledging that there were – that there were possibly clients that he could keep, then must have rejected that standard, right? Correct. After the court's order, then there was a factual hearing in front of Judge Holmick at the district court. There was no evidence presented by appellants regarding the 37 clients that the district court ultimately determined fell within the BBO Seidman standard. This is at the remand hearing? At the remand hearing, correct, Your Honor. Therefore, in our opinion, this issue has been addressed by the court, by this court, and the district court, and was specifically set forth in the opinion that appellants are. So in the first appeal, the court granted the injunction, right? Correct. And it applied to all of the clients? It applied to the two clients, Brian Hall and Mr. Thompson. No, I meant your clients' clients. But anyway, and then you appealed. Correct. And you argued in favor of the BBO standard. For Mr. Thompson, we argued in favor of the BBO standard. Mr. Thompson was in a materially different position than Mr. Hall because Mr. Hall was an owner of HSB and a signatory to the asset protection. Okay. And in that appeal, they argued that the BBO standard doesn't apply to Mr. Thompson because it was in conjunction with a sale. Is that correct? Correct. Yeah, it is set forth in their brief at page 30 of their brief. They specifically argued in the earlier appeal that Mr. Thompson was subject to the sale of his standard, and the court rejected that argument because he did not sell anything. But do you – I mean, I don't see anything in the prior opinion that addresses that. I mean, I do understand that what the court, in fact, did was revamp her application of that standard, but just – do you see anything in that discussion that says the standard doesn't apply to him because he wasn't part of the sale? See, nothing in the opinion specifically addresses that. There was discussion at the whole argument. I understand that that's not part of the opinion. Judge White, my reading of the opinion by application of BBO was that the court acknowledged that the BBO standard is the one that applies to Mr. Thompson, but it was not – that was not specifically stated in the opinion, at least as I can recall it right now. Therefore, we believe this issue has been specifically addressed, dealt with by this court, that there was no reasonable basis to file this appeal, and would rest on our briefs or answer any additional questions. And what is left – this was a preliminary injunction. What's left of the case in the trial court? The case would be set for trial, and there's a significant amount of discovery that would yet to be done and that would precede the trial. Due to the appeals, it has delayed the progress of the case significantly. But this is – this is a preliminary ruling based on what's in front of the judge. Correct. It's a preliminary ruling based on the evidence that was presented at the injunction hearing and then evidence that was subsequently presented at the hearing on the motion for remand. Thank you. Okay. Thank you, Counsel. I actually believe it was correct in Appeal No. 1 for the court to have remanded the case. Why? Because there had never been a developed record or argument made with regard to allocation of clients on the spectrum of events. The facts are not in dispute, and we now have that record. It is – it respectfully would be incorrect to use deductive reasoning to suggest that the court necessarily in Appeal 1 rejected the argument I'm making today. Why? Because it only knew that the VDO Seidman had been – standard had been pled and by plaintiffs – remember, Mr. Tubbs and Mr. Hall initially brought this claim as a declaratory judgment as plaintiffs – alleging and asserting that the VDO Seidman standard controlled the entire case. We never got to the point in the district court in getting – in the TRO or preliminary injunction stage where the court considered or took any evidence with regard to when client relationships had been formed. We go up on appeal, and for the first time on appeal, that issue arises during this course of oral argument. And it was at that point that I told the court there was no record on this issue, and it must necessarily remand for purposes of what I referred to then as allocation, and I refer to it now as allocation. And it was appropriate to do that. Why? Because it turns out that based on the undisputed evidence, there are some clients that fall under the VDO Seidman standard, but under the Johnson Controls case, once Mr. Thompson became employed at USI, he was under the VDO Seidman standard. And if USI's resources were used to perpetuate those relationships and form those relationships, those clients are subject to – still subject to the restrictive covenants under VDO Seidman. So that's the allocation post-USI. I'm sorry. You know, I'm just not following you because when Judge Nelvanian asked you if it were the rule for the asset sale, he wouldn't be able to take any of his clients, and you said yes. For two different reasons. That's exactly – if the rules with regard to asset sales control in its entirety, he can't take any clients. What I'm telling the panel is that the timing of when these things occur triggers a different standard, and that's why I'm suggesting that the remand that occurred on appeal number one was appropriate because there was no evidence as to when these relationships were formed. And all relationships that were formed prior to the time there was an asset sale to USI is controlled by the ancillary to the sale of business standard. Those clients – I'm sorry. All the clients that he accumulated – I'm sorry – prior to the asset sale by pilot to USI. But that's everybody. No, no, no, it's not. No, it's not. The district court dealt with 41 clients. I'm sorry. All of the ones that were accumulated prior to the asset sale were governed by what? By which standard? The ancillary to sale of business standard. That amounts to 37 clients, which were relationships were formed by Mr. Thompson prior to his formation of Highland and while he was at Highland. There was then an asset sale to USI. Those 37 client relationships exist. Those 37 client relationships are governed by the ancillary to sale of business standard. Mr. Thompson represented his employment agreement that he was giving up on – That's your argument. I understand. But then why do you need an apportionment? Because there actually were four clients that were correctly subject to the BDO Seidman standard. The district court addressed that properly. It's these 37 clients that are the subject of this current appeal that should have been treated under the ancillary to the sale of business standard. But you just flipped them. No, no, no, Your Honor. I didn't. I didn't. Why would you apply the BDO standard to the ones that – Because after he becomes an employee of USI, okay, he is then simply an employee of USI. Clients that he formed then, he said in the district court, his position was he didn't get any support with regard to those clients. The district court found differently, and under Johnson Controls, which is a case that tracks BDO Seidman for employees, if your client is providing you with resources and benefits to attract those clients, the restrictive covenants still apply. That's those four. The 37 prior to the asset purchase sale from Highland to USI remain subject to that standard. The district court has never addressed that standard. So all that means is that you have another chance. I mean this is a preliminary ruling. Where the district court on this issue, as a matter of law and undisputed facts, got the application of New York law wrong, and it should be corrected by this court. Thank you. Okay, thank you, counsel, and both of you for your arguments today. The case will be submitted. And clerk may adjourn the court.